# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON BRISENO,<br><br>          Plaintiff,<br><br>     v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social<br>Security,<br><br>          Defendant. | ) 1:04-CV-6292-OWW-SMS<br>)<br>) FINDINGS AND RECOMMENDATIONS ON<br>) SOCIAL SECURITY COMPLAINT (DOC.<br>) 1)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff is proceeding with counsel and is seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying an application for benefits. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C.§ 636(b) and Local Rule 72-302(c)(15). The matter is currently before the Court on the parties' briefs, which have been submitted without oral argument.

## PROCEDURAL HISTORY

On March 22, 1999, Plaintiff protectively filed for Supplemental Security Income (SSI), alleging disability since March 17, 1997, due to back, leg, shoulder, and knee pains (Tr. 178-82) as well as foot pain, prostate problems, and depression

1

1  (Tr. 201-210). After Plaintiff's claim was denied initially and
2  on reconsideration, Plaintiff requested, and appeared at, a
3  hearing before the Honorable James P. Berry, Administrative Law
4  Judge (ALJ) of the Social Security Administration (SSA), on May
5  1, 2000, which resulted in a decision that Plaintiff was disabled
6  as of April 5, 2000, but not before that date. (Tr. 37, 127-39,
7  104-12, 464-99.) Plaintiff sought review of the ALJ's decision by
8  the Appeals Council, which granted the request for review and
9  remanded the matter to the ALJ for consideration of disability
10 before April 5, 2000. (Tr. 168-70.) On July 7, 2003, another
11 hearing was held before ALJ Berry at which Plaintiff was
12 represented by an attorney and testified through a translator,
13 and at which a vocational expert (VE) also testified. (Tr. 500-
14 14.) On June 23, 2003, the ALJ decided that Plaintiff was not
15 disabled before April 5, 2000. (Tr. 17-25.) The Appeals Council
16 denied Plaintiff's request for review on July 27, 2004. (Tr. 9-
17 11.)

18     Plaintiff filed her complaint on September 21, 2004.
19 Briefing commenced with Plaintiff's opening brief being filed on
20 May 26, 2005, followed by Defendant's opposition on August 2,
21 2005, and finally, Plaintiff's reply on August 17, 2005.

22                          FACTUAL SUMMARY

23     The ALJ found that Plaintiff had severe impairments of
24 degenerative joint disease of the right knee, lumbar spondylosis,
25 diabetes mellitus, hypertension, gout, and depression that did
26 not meet or medically equal a listed impairment; before April 5,
27 2000, Plaintiff had the residual functional capacity (RFC) to
28 perform simple, repetitive medium work activity, including a

1 significant range of medium work; he was fifty-seven years old at
2 the time of the ALJ's decision, and was fifty-four years old
3 before April 5, 2000, and thus was then closely approaching
4 advanced age, and he had a marginal sixth grade education and was
5 unable to communicate in English. He could make a successful
6 adjustment to work and could perform unskilled medium work, and
7 specifically, positions existing in significant numbers in the
8 national economy, including those of a seed cutter, hand
9 packager, and machine packager. Therefore, Plaintiff was not
10 disabled before April 5, 2000.

11    The pertinent medical evidence and testimony are summarized
12 in connection with the following discussion of the issues raised
13 by Plaintiff.

14                SCOPE AND STANDARD OF REVIEW

15    Congress has provided a limited scope of judicial review of
16 the Commissioner's decision to deny benefits under the Act. In
17 reviewing findings of fact with respect to such determinations,
18 the Court must determine whether the decision of the Commissioner
19 is supported by substantial evidence. 42 U.S.C. § 405(g).
20 Substantial evidence means "more than a mere scintilla,"
21 Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a
22 preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10
23 (9th Cir. 1975). It is "such relevant evidence as a reasonable
24 mind might accept as adequate to support a conclusion."
25 Richardson, 402 U.S. at 401. The Court must consider the record
26 as a whole, weighing both the evidence that supports and the
27 evidence that detracts from the Commissioner's conclusion; it may
28 not simply isolate a portion of evidence that supports the

                                3

1  decision. <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).

2  It is immaterial that the evidence would support a finding

3  contrary to that reached by the Commissioner; the determination

4  of the Commissioner as to a factual matter will stand if

5  supported by substantial evidence because it is the

6  Commissioner's job, and not the Court's, to resolve conflicts in

7  the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th

8  Cir. 1975).

9      In weighing the evidence and making findings, the

10 Commissioner must apply the proper legal standards. <u>Burkhart v.</u>

11 <u>Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must

12 review the whole record and uphold the Commissioner's

13 determination that the claimant is not disabled if the

14 Commissioner applied the proper legal standards, and if the

15 Commissioner's findings are supported by substantial evidence.

16 <u>See,</u> <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d

17 509, 510 (9th Cir. 1987); <u>Jones v. Heckler</u>, 760 F.2d at 995. If

18 the Court concludes that the ALJ did not use the proper legal

19 standard, the matter will be remanded to permit application of

20 the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th

21 Cir. 1987).

22                              <u>ANALYSIS</u>

23      I. <u>Disability</u>

24      In order to qualify for benefits, a claimant must establish

25 that she is unable to engage in substantial gainful activity due

26 to a medically determinable physical or mental impairment which

27 has lasted or can be expected to last for a continuous period of

28 not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A

                                    4

1  claimant must demonstrate a physical or mental impairment of such

2  severity that the claimant is not only unable to do the

3  claimant's previous work, but cannot, considering age, education,

4  and work experience, engage in any other kind of substantial

5  gainful work which exists in the national economy. 42 U.S.C.

6  1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th

7  Cir. 1989). The burden of establishing a disability is initially

8  on the claimant, who must prove that the claimant is unable to

9  return to his or her former type of work; the burden then shifts

10 to the Commissioner to identify other jobs that the claimant is

11 capable of performing considering the claimant's residual

12 functional capacity, as well as her age, education and last

13 fifteen years of work experience. Terry v. Sullivan, 903 F.2d

14 1273, 1275 (9th Cir. 1990).

15     The regulations provide that the ALJ must make specific

16 sequential determinations in the process of evaluating a

17 disability: 1) whether the applicant engaged in substantial

18 gainful activity since the alleged date of the onset of the

19 impairment, 2) whether solely on the basis of the medical

20 evidence the claimed impairment is severe, that is, of a

21 magnitude sufficient to limit significantly the individual's

22 physical or mental ability to do basic work activities; 3)

23 whether solely on the basis of medical evidence the impairment

24 equals or exceeds in severity certain impairments described in

25 Appendix I of the regulations; 4) whether the applicant has

26 sufficient residual functional capacity, defined as what an

27 individual can still do despite limitations, to perform the

28 applicant's past work; and 5) whether on the basis of the

1 applicant's age, education, work experience, and residual

2 functional capacity, the applicant can perform any other gainful

3 and substantial work within the economy. See 20 C.F.R. § 416.920.[1]

4    II. Bias of the ALJ

5    Plaintiff argues that the ALJ was biased on the basis of

6 asserted facts that are not reflected in the record before the

7 Court, including a statement that the ALJ approves only fifteen

8 to twenty per cent of all cases before him, whereas the national

9 average is sixty-three per cent; he denies multiple cases in a

10 row; he has not approved a single case at the office after he was

11 challenged in a specific manner; he is biased against mental

12 health claimants, having allegedly represented to Plaintiff's

13 counsel that everyone can do at least simple, repetitive tasks;

14 and he attempted to get a client to proceed without counsel.

15 Counsel states that due to the ALJ's general bias and bias

16 against counsel for challenging him, the ALJ approved Plaintiff

17 only two months before the date of decision, thus knocking out

18 retroactive benefits. Counsel claims that he is seeking to file

19 an ethics charge against the ALJ. Plaintiff's counsel argues that

20 there is no remedy for ALJ bias, and that there is no way to

21 document any of the facts claimed unless the Court provides a

22 remand for investigation into this claim.

23    First, as Defendant notes, the system did not lack a remedy

24 for claims of bias at the pertinent time. Title 20 C.F.R. §

25 416.1440 expressly provides that an ALJ shall not conduct a

26 hearing if he or she is prejudiced or partial with respect to any

27

28

---

[1] All references are to the 2003 version of the Code of Federal Regulations unless otherwise stated.

6

1  party or has any interest in the matter pending for decision;

2  further, if one objects to the ALJ, one must notify the ALJ at

3  the earliest opportunity, and the ALJ shall consider the

4  objections and decide whether to proceed or withdraw. If an ALJ

5  declines to withdraw, the claimant may present the objections to

6  the Appeals Council as reasons why the hearing decision should be

7  revised or a new hearing be held before another ALJ.

8      Plaintiff does not indicate that he proceeded pursuant to

9  this regulation or otherwise objected to the ALJ.

10      With respect to Plaintiff's claim of bias, Plaintiff cites

11  no legal authority with respect to bias. Quasi-judicial officers,

12  such as administrative law judges, are presumed to be unbiased,

13  but the presumption may be rebutted by a showing of conflict of

14  interest or some other specific reason for disqualification.

15  Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001)

16  (holding that expressions of impatience, annoyance, and even

17  anger did not establish bias). In order to establish bias, one

18  must show that the ALJ's behavior, in the context of the whole

19  case, was so extreme as to display clear inability to render fair

20  judgment. Id. at 858 (quoting Liteky v. United States, 510 US.

21  540, 555-56 (1994)).

22      Plaintiff's asserted proof does not amount to evidence; its

23  substance and context are not developed in the record.

24  Accordingly, the Court does not consider Plaintiff's extra-record

25  assertions to be established facts of evidentiary value in this

26  analysis.

27      However, even if the Court were to accept Plaintiff's extra-

28  record assertions regarding past conflict between the ALJ and

7

1  Plaintiff' counsel, it would not establish bias. <u>Cf.</u> <u>Bunnell v.</u>
2  <u>Barnhart</u>, 336 F.3d 1112, 1114 (9th Cir. 2003) (holding that the
3  standard of appearance of impropriety is inapplicable to
4  administrative law judges, who are governed by regulations
5  requiring actual bias, and further holding that Plaintiff's
6  counsel's having sued the ALJ in the past did not demonstrate
7  actual bias where a motion to recuse had been denied).

8      Further, even if the Court were to accept Plaintiff's
9  counsel's extra-record assertions of a high statistical showing
10 of unfavorable rulings, this would not demonstrate bias. <u>In re</u>
11 <u>Beverly Hills Bancorp</u>, 752 F.2d 1334, 1340 (9th Cir. 1984).

12     With respect to the assertion that the evidence is
13 completely to the contrary of the ALJ's decision, the Court will
14 more specifically address Plaintiff's precise contentions below.
15 The Court further notes that the ALJ had previously determined
16 that Plaintiff was actually disabled after April 5, 2000. (Tr.
17 104-12.) Thus, it appears that the ALJ has made some findings in
18 favor of the Plaintiff and has not completely rejected the
19 evidence supporting a finding of disability at some point in
20 time.

21     In summary, the record here does not reveal any specific
22 basis for disqualification or any basis for a conclusion that the
23 ALJ was unable to render fair judgment or was otherwise actually
24 biased. The Court rejects Plaintiff's assertion that the ALJ was
25 biased.

26     III. <u>Plaintiff's Subjective Complaints</u>

27     Plaintiff makes several arguments regarding the ALJ's
28 treatment of Plaintiff's testimony and his credibility.

1    Plaintiff asserts that the ALJ did not fully or fairly

2  review the testimony; however, Plaintiff did not specify in what

3  respect the ALJ's treatment was deficient other than saying that

4  the rational was vague, not supported by citation to evidence,

5  and incompletely or improperly represented.

6    The existence and severity of a person's reaction to a

7  physical ailment, such as the existence and severity of pain, are

8  subjective phenomena, the extent of which cannot be objectively

9  measured. Byrnes v. Shalala, 60 F.3d 639, 642 (9th Cir. 1995). In

10  order to reject a claimant's subjective complaints, the ALJ must

11  provide specific, cogent reasons for the disbelief. Lester v.

12  Chater, 81 F.3d 821, 834 (9th Cir. 1995). Once the claimant

13  introduces medical evidence of an underlying impairment that

14  could reasonably be expected to produce some degree of the

15  subjective symptoms, the Commissioner may not discredit the

16  claimant's testimony as to subjective symptoms merely because

17  they are unsupported by objective evidence such as objective

18  medical findings. Id.; Smolen v. Chater, 80 F.3d 1273, 1282 (9th

19  Cir. 1996). Unless there is affirmative evidence tending to show

20  that the claimant is malingering, the reasons for rejecting the

21  claimant's testimony must be clear and convincing, and the ALJ

22  must set forth the rejection by identifying what testimony is not

23  credible and what evidence undermines the claimant's complaints.

24  Lester v. Chater, 81 F.3d at 834. The findings of the adjudicator

25  must be properly supported by the record and must be sufficiently

26  specific to allow a reviewing court to conclude that the

27  adjudicator rejected the claimant's testimony on permissible

28  grounds and did not arbitrarily discredit a claimant's testimony.

Bunnell v. Sullivan, 947 F.2d 341, 345-46; Byrnes v. Shalala, 60 F.3d at 641-42 (9th Cir. 1995); see 20 C.F.R. § 404.1529(c) [disability] and 20 C.F.R. § 416.929(c) [supplemental security income].

Social Security Ruling 96-7p directs the adjudicator to consider not only objective medical evidence of signs, laboratory findings, and medical opinions, but also the following factors when assessing the credibility of an individual's statements:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and adverse side effects of any medication for pain or other symptoms;
5. Treatment, other than medication, for relief of pain or other symptoms;
6. Any measures other than treatment used by the individual to relieve the pain or other symptoms; and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

See also Bunnell v. Sullivan, 947 F.2d at 346.

Here, the ALJ articulated various reasons for expressly rejecting as unconvincing and unpersuasive Plaintiff's subjective complaints that debilitating pain and limitations, side-effects of medications, and mental impairment caused him to be markedly limited in his exertional activities and to be unable of performing all work activity before April 5, 2000: 1) lack of substantiation in the medical record; 2) with respect to pain, lack of referral to a pain in specialist or treatment with a TENS unit; 3) with respect to his depression, lack of referral to counseling or psychotherapy, and treatment limited to psychotropic medication prescribed by his treating physician, as

well as a lack of symptoms; 4) performance of a full range of activities of daily living, including managing his self-care activities, driving, traveling, watching TV and movies, attending church services, etc.; and 5) the opinion of Dr. Greenleaf that Plaintiff could perform simple routine tasks with little public contact. (A.R. 22.)

Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999). The medical record supports the ALJ's conclusion.

As to Plaintiff's diabetes, the ALJ noted that despite some problems associated with Plaintiff's failure to observe the proper diet or to take the proper medications regularly, Plaintiff's diabetes was otherwise generally controlled with medication and outpatient care; there was no evidence of end-organ damage, motor or sensory deficits, or need for an assistive device or hospital or emergency care. (Tr. 21-22.) The record supports this finding. (Tr. 432, 443, 431, 442, 440, 428, 427, 437, 352, 351, 350, 349, 341, 383, 380, 379, 369, 436, 435, 420.)

The ALJ noted that Plaintiff's hypertension was generally stable with prescribed medication, and the record contained evidence that although Plaintiff's hypertension was uncontrolled in November 1997 when he ran out of medication, it was generally stable or controlled during the period from 1997 through April 2000. (Tr. 20, 430, 432, 443, 351, 348, 384, 436.)

1    The ALJ acknowledged that Plaintiff had complaints of chest

2  pain and associated symptoms; however, an EKG in May 1997

3  revealed normal sinus rhythm with no Q waves, and no ST

4  elevation, or depression; the diagnosis was atypical chest pain,

5  and Plaintiff continued taking nitroglycerin. (Tr. 20, 433-34.)

6  Plaintiff denied any chest pain or shortness of breath in January

7  1998 (Tr. 428); he complained of dizziness, left arm numbness,

8  anxiety, and chest pain in January 1999, but an EKG was normal,

9  and the diagnosis was chest pains secondary to costochondritis

10 and dizziness secondary to anxiety. (Tr. 344.)

11    Plaintiff claimed that he suffered pain from a knee

12 impairment as well as from back pain and gout.

13    The ALJ noted Plaintiff's gout, which was treated in 1998

14 and improved with medications and hot packs. The record reveals

15 complaints of gout in various joints which resolved after the

16 treatment. (Tr. 18, 262-63.) The ALJ also noted conservative

17 treatment for bunions, mycosis, and tinea. (Tr. 18, 420-21.)

18    With respect to Plaintiff's knee problems, the ALJ recited

19 the history of Plaintiff's symptoms and treatment of the knees.

20 An x-ray in March 1997 revealed a small knee effusion and minimal

21 patellar osteophytes in the right knee, with no significant joint

22 space narrowing. In November 1997, the left knee exhibited mild

23 degenerative joint disease with mild medial joint space

24 compromise. (Tr. 19, 446-47, 317.) In January 1998, another x-ray

25 of the right knee revealed mild degenerative joint disease with

26 mild medial joint space compromise, and an effusion. (Tr. 313.)

27 Plaintiff's knee was improving in late January, and he was using

28 a cane; Plaintiff reported that an aspiration performed a week

previously had helped considerably. (Tr. 311-12.)

     In March 1998 Plaintiff reported to Dr. Janda that his right knee was improved; Plaintiff was examined and had essentially normal range of motion at both knees with 1+ PF crepitus, no effusion, and apparently stable ligaments. The impression was resolved left and right medial collateral ligament strains. (Tr. 310.) A similar impression was reached after examination on July 1, 1998, and thereafter in September, November, and December 1998, the range of motion remained unchanged. (Tr. 308, 306, 305.)

     In February 1999, Plaintiff still had complaints about the right knee, medially, although the right knee was doing better, with a range of motion from about a couple of degrees to 120 degrees of flexion. (Tr. 304.) Based on complaints of intermittent effusion with locking and giving way at the right knee, in March 1999, Dr. Janda recommended a right knee arthroscopy with possible arthrotomy. (Tr. 303.) In April Dr. Janda observed flexion of five to 115 degrees with pain at the medial joint line, a 1+ effusion with 2+ patellofemoral crepitus with positive patellar inhibition and apprehension tests at the right knee; the left knee revealed zero to 120 degrees of flexion, 1+ patellofemoral crepitus, no effusion, and stable ligaments bilaterally. (Tr. 300.)

     Knee surgery in April 1999 yielded right knee shavings that were submitted for laboratory analysis, which in turn revealed mild chronic synovitis and reactive changes in the right knee. (Tr. 298, 406-10.) A postoperative diagnosis was chondrocalcinosis, torn anterior horn of the right medial

meniscus, torn mid-substance and posterior horn areas of the lateral miniscus with a peripheral tear which was very superficial in the midsubstance area and in the posterior horn areas; degenerative arthritis at the right knee with grade IV chondromalacia at the patellofemoral joint; grade III chondromalacia at the right lateral tibial condyle; and synovitis at the right knee joint. (Tr. 406-10.)

In May 1999 Dr. Janda reported that Plaintiff's right knee was doing very well; the exam portals were well healed, and neurovascular and circulatory status were intact with a negative Homans' sign. (Tr. 296, 402.) In June there was good healing and no sign of infection; Plaintiff was to continue with exercise and medication. (Tr. 401.) The neurovascular and circulatory status of the right and left lower extremities were intact, and Plaintiff had improved range of motion at the right knee with five to 130 degrees of flexion. (Tr. 400.)

Plaintiff continued to complain of pain at the right knee; in September 1999 there was no effusion, and ligaments were stable. Flexion of five to 120 degrees was noted with mild medial joint space compromise and pain in the right patellar facet, and negative Lachman's test. The impression was mild to moderate degenerative joint disease at the right knee with degenerative cartilagic changes; osteoarthritis; and status post-right knee arthroscopy with continued pain. (Tr. 398.) Dr. Janda recommended injections. (Id.) This impression remained in December 1999. (Tr. 395.)

In September 1999, Dr. John Nork performed a consultative orthopedic examination and evaluation. Plaintiff's main complaint

14

1  was low back pain after walking a lot. Dr. Nork noted that all
2  the joints involving the knee, hands, and ankles were warm;
3  however, there was no acute redness or flare, joint effusion, or
4  ligamentous instability; range of motion of the right knee was
5  zero to 110, with normal being zero to 150; sensation was normal;
6  and gait was abnormal. Motor strength was normal, and flexion and
7  extension were within normal limits in the knees; sensation was
8  normal to pinprick and light touch; there was no drift or atrophy
9  noted. Reflexes were normal. Plaintiff walked favoring his right
10 lower extremity but was capable of walking without the aid of a
11 cane; he used a cane for protection because he was recovering
12 from the knee surgery. He could stand on his toes and heels but
13 was reluctant to walk on them. Dr. Nork diagnosed some sort of
14 diffuse generalized arthritis or arthritic process and possibly
15 gout; however, Plaintiff functioned quite well. Dr. Nork opined
16 that Plaintiff was limited in his ability to perform basic work-
17 related restrictions such as climbing, stooping, crawling, and
18 kneeling on a temporary basis until he recovered from knee
19 surgery. (Tr. 358-62.)

20     In February 2000, Plaintiff's right knee was doing better,
21 but he still had discomfort in the parapatellar area of the right
22 knee; x-rays revealed mild degenerative joint disease at both
23 knees with mild patellofemoral arthritis. (Tr. 392-93.)

24     The ALJ noted that the evidence showed only mild
25 degenerative joint disease in the right knee in 1999 and less
26 than two months before April 5, 2000; further, Dr. Nork placed
27 only temporary limitations on Plaintiff's activities due to
28 recuperation from surgery. (Tr. 22.)

With respect to Plaintiff's claim of back pain, the ALJ reviewed the pertinent medical history. He noted Dr. Janda's evaluation in June 1997, reflecting forward flexion of the lumbar spine to fifty degrees; full straight leg raising in the seated position; negative Laseque's and crossed Laseque's test; mild paraspinal muscle spasm primarily at the right of L5-S1; deep tendon reflexes were 2+ and equal; exercise was recommended, and medications prescribed for pain and spasm. (Tr. 19, 321-23.) X-rays revealed mild levoscoliosis, mild lumbar spondylosis with severe compromise at L5-S1 and less so at L4-L5, early vascular calcification, facet arthropathy at L4 and L5, and spina bifida occulta at L5. (Tr. 323.) The impression was mild lumbar spondylosis with severe facet arthropathy at L5, and severe disc space compromise at L5/S1 as well as S1 subjective right sciatica. (Tr. 322.)

The ALJ also noted Dr. Nork's consultative orthopedic exam of September 1999, at which Plaintiff complained of low back pain after he walked a lot; he denied radiation of back pain, extremity numbness, tingling, pins and needles, or weakness. (Tr. 358-62.) The exam revealed forward flexion of the lumbar spine to sixty degrees, extension and right and left bending were all ten degrees; straight leg raising test sitting and supine were normal; and gait was abnormal because Plaintiff favored his right leg due to recent knee surgery but was capable of walking without a cane. Contour, curvature, and alignment of the lumber spine was normal with mild tenderness to palpation; there was no spasm present. Dr. Nork diagnosed some type of arthritic process and/or gout, but noted that Plaintiff functioned quite well and had

limitations in climbing, stooping, crawling, and kneeling, anticipated to be temporary, resulting from knee surgery recovery.  (Tr. 19-20, 358-62.)

The ALJ further noted Dr. Janda's exam of Plaintiff on February 25, 2000, revealing complaints of low backache, full seated straight leg raising tests, ability to elevate lower extremities to about forty degrees on the right and forty-five on the left, and absence of focal neuromotor deficits; films of the lumbar spine revealed mild levoscoliosis with spina bifida occulta, mild facet arthropathy, and mild lumbar spondylosis. (Tr. 20, 392, 393.)

The ALJ then noted that although Plaintiff had alleged disability based on back pain, and he had been treated for it and had suffered some limited mobility in the lumbar spine, he did not suffer from a herniated disc; there were no motor or sensory deficits, and no pathological reflexes; Plaintiff was not being considered as a surgical candidate; he required no hospital or emergency care for back pain; and lumbar x-rays of February 2000 (less than two months before the established onset date) showed only mild conditions. (Tr. 22.)

The ALJ noted that despite claims of debilitating pain, Plaintiff had not been referred to a pain specialist or treated with a TENS unit before April 5, 2000. (Tr. 22.) The record supports this statement.

With respect to Plaintiff's depression, the ALJ noted that Plaintiff was not suicidal, homicidal, psychotic, or beset with hallucinations. The report of Dr. Stephen M. Greenleaf, M.D., a consulting psychiatrist, supports the ALJ's findings and reveals

17

1  that when examined on October 13, 1999, Plaintiff denied being
2  suicidal or homicidal and stated that his antidepressant (which
3  was unidentified) helped some; Dr. Greenleaf found that Plaintiff
4  was not homicidal, suicidal, or experiencing hallucinations or
5  delusions. (Tr. 364-65.) The ALJ concluded that the record did
6  not convincingly show that Plaintiff could not function
7  occupationally or socially. (Tr. 22.) Dr. Greenleaf's exam
8  supported these findings. It revealed that although Plaintiff
9  complained that he had trouble with memory, attention, and
10 concentration, the examination showed that Plaintiff had
11 normoproductive, logical, and coherent speech; he was alert and
12 oriented times four; at five minutes he remembered two of three
13 words previously registered; there was no apparent problem with
14 long term memory and fund of knowledge; he added two two-digit
15 numbers in his head without hesitation and added the face values
16 of three coins together; performed a three-step command
17 accurately and efficiently; counted backwards in Spanish from ten
18 without error and made one error in English; and his attention
19 and concentration were good. (Tr. 364-66.) Dr. Greenleaf
20 diagnosed major depression, recurrent, currently moderate, with
21 moderate cognitive deficits and a global assessment of
22 functioning of 60; Plaintiff could follow one- and two-step
23 commands and could work promptly and regularly with adequate pace
24 and persistence; he could function in an environment with little
25 peer or public contact. (Tr. 366-67.)

26      The ALJ also relied on the fact that Plaintiff had not been
27 referred to counseling or psychotherapy. (Tr. 22.) The record
28 reveals that Plaintiff reported having been hospitalized twice in

18

1  1986 and 1987, close to the time of the death of his nine-year-

2  old daughter. (Tr. 364.) Plaintiff does not cite to any part of

3  the record that would contradict the ALJ's finding. An ALJ may

4  rely on the conservative nature of treatment or a lack of

5  treatment in rejecting a claimant's subjective complaint. <u>Johnson</u>

6  <u>v. Shalala</u> 60 F.3d 1428, 1433-34 (9th Cir. 1995) (pain).

7       The record, which was fully reviewed by the ALJ, contained

8  substantial evidence supporting the ALJ's finding that the

9  medical record did not support Plaintiff's subjective complaints,

10  and that Plaintiff had received essentially conservative

11  treatment for his conditions. Conflicts in the medical evidence

12  which were resolved by the ALJ are discussed in more detail in

13  the analysis hereinbelow concerning expert opinions.

14       Finally, the ALJ concluded that Plaintiff was capable of a

15  full range of activities of daily living, including managing

16  self-care, driving, traveling, watching TV, watching movies, and

17  attending church, etc. (Tr. 22.) The record supports the ALJ's

18  conclusion. Plaintiff testified that he had a driver's license.

19  He had no difficulty using his hands before April 5, 2000, for

20  tasks such as brushing his teeth, combing his hair, or driving;

21  his daily activities included watching TV and movies, attending

22  church, and driving. (A.R. 504-506.)[2] Plaintiff's exertional daily

23  activities questionnaire dated April 12, 1999, reveals that

24  Plaintiff responded that he would groom himself, go out, visit

25

26       [2] Plaintiff did testify that he had some drowsiness and stomach ache as
    side-effects of his medications, and he could only lift ten pounds, had pain
27  in his legs and back, could walk forty-five minutes to half an hour during an
    eight-hour day; stand half an hour; sit for an hour, stand, and then sit
28  another hour, for a total of three and one-half hours during an eight-hour
    day. The ALJ noted these claims. (Tr. 21.)

friends, sometimes take a walk around a block or two blocks, go to the store, try to help his wife around the house, perform cleaning or tasks that did not involve lifting very heavy things or bending very far or standing for a long time, do dishes and sweeping, etc., or sit and watch TV; when in pain he would need help to balance or dress, and often at the store he would wait in the car due to pain in his back or knee. He was alone at home during the day and did not need help to get out of the house, and he did things carefully. (Tr. 227-28.)

A claimant's ability to engage in activities of daily living to the extent that he or she spends a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to the work setting is relevant; a specific finding as to this fact may be sufficient to discredit a claimant's allegations. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). Attendance at school or efforts to find employment may be considered, Gay v. Sullivan, 986 F.2d 1336, 1339 (10th Cir. 1993), as may the extent of an applicant's attempts to obtain relief from symptoms, Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). Here, the evidence supports the ALJ's finding.

Finally, the ALJ noted that even Dr. Greenleaf opined that Plaintiff could perform simple, routine tasks with little public contact. It is established that a doctor's opinion that a claimant can work is appropriately considered. Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995).

It was appropriate for the ALJ to consider the lack of

objective indicia of Plaintiff's impairments, including lack of objective clinical findings, inconsistent activities of daily living, use of conservative treatment, extent of efforts to obtain relief, and effectiveness of medications in controlling the symptoms. Soc. Sec. Ruling 96-7p and 20 C.F.R. § 416.929(c)(4)(1)(vii); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d at 346 (9th Cir. 1991); <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995).

The Court concludes that the ALJ cited clear and convincing reasons for rejecting Plaintiff's subjective complaints of pain to the extent alleged, and that the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony.

### IV. Illiteracy

In connection with Plaintiff's claim that the ALJ did not properly consider and review the testimony of record, Plaintiff argues that the ALJ wrongly "passed over the literacy issue" to which Plaintiff testified, citing Tr. 18 and 41; Plaintiff requests a remand for testing for literacy and for a better copy of school records, citing Tr. 243. Plaintiff argues that at age 45, Rule 201.17 is applicable if Plaintiff is illiterate, citing Tr. 467-69 and 504.

Defendant does not respond to this contention.

Plaintiff's reference to Rule 201.17 appears to be misplaced. This particular rule concerns claimants with a residual functional capacity (RFC) limited to sedentary work. 20

21

C.F.R. Part 404, Subpart P, Appendix 2, § 201. However, the ALJ
in this case found that Plaintiff had the RFC to perform a
significant range of medium work. Thus, this rule does not apply.

The ALJ noted that Plaintiff was fifty-seven years old with
a marginal education obtained in Mexico. (Tr. 18.) Plaintiff's
citation to Tr. 41 is to a medical/vocational decision guide
prepared by departmental analysts that indicates in part that
Plaintiff is illiterate. However, Plaintiff himself testified
that he could read a little English but could not write, and he
had a driver's license (Tr. 504); the ALJ's decision reflected
this information because it stated that Plaintiff could read a
little English but could not write English (Tr. 21). Illiteracy
is defined as the inability to read or write by someone generally
with little or no formal schooling. 20 C.F.R. § 416.964(b)(1). A
marginal education connotes ability in reasoning, arithmetic, and
language skills which are needed to do simple, unskilled types of
jobs, generally involving formal schooling at a sixth grade level
or less. 20 C.F.R. § 416.964(b)(2).

The Court concludes that the record does not support
Plaintiff's assertion of illiteracy, and Plaintiff has not shown
that the ALJ applied incorrect law with respect to Plaintiff's
educational level. There does not appear to be any legal error.

V. <u>Medical Evidence</u>

Plaintiff makes several arguments regarding the ALJ's
consideration and evaluation of conflicting medical evidence.

Preliminarily, the Court notes that the Appeals Council
remanded the case to the ALJ to consider disability for the time
before April 5, 2000, based on the report of April 5, 2000 of Dr.

1  Janda; Plaintiff's arthrosopic knee surgery in April 1999; and
2  the report of consulting examining doctor in September 1999 that
3  reflected that Plaintiff had abnormal gait and used a cane. (Tr.
4  169.) Although the Appeals Council referred to Exhibit 18F as the
5  source of the consulting examiner's opinion, that exhibit, which
6  appears at Tr. 420-21, does not reflect the data regarding the
7  cane or gait; instead, this information is contained in the
8  September 1999 report of Dr. Nork, who observed Plaintiff using a
9  cane five months after the knee surgery for "protection" purposes
10 and further observed abnormal gait in that Plaintiff favored his
11 right lower extremity but was capable of walking without the aid
12 of a cane. (Tr. 358-59.)

13     The Court further notes that it is the Plaintiff's burden to
14 prove the onset date of disability. Morgan v. Sullivan, 945 F.2d
15 1079, 1080 (9th Cir. 1991) (disability insurance benefits).

16                    A. Rejection of Treating Doctors' Opinions

17     The ALJ concluded that Plaintiff's disability commenced as
18 of the report of April 5, 2000, of treating orthopedist and
19 rehabilitation specialist Dr. Janda. Plaintiff argues that the
20 ALJ's rejection of the opinions of Dr. Janda's and of treating
21 physician Dr. Abdulrahman limiting Plaintiff to sedentary work
22 was not supported by substantial evidence.

23     An ALJ may disregard a treating physician's opinion that is
24 controverted by other opinions only by setting forth specific,
25 legitimate reasons for doing so that are based on substantial
26 evidence in the record. Rodriquez v. Bowen, 876 F.2d 759, 762 (9th
27 Cir. 1989). This burden is met by stating a detailed and thorough
28 summary of the facts and conflicting clinical evidence, stating

1   the interpretation of the evidence, and making findings. <u>Cotton</u>
2   <u>v. Bowen</u>, 799 F.2d 1403, 1408 (9th Cir 1986). However, if the
3   medical opinion of a claimant's treating physician is
4   uncontroverted, then an ALJ must present clear and convincing
5   specific reasons, supported by substantial evidence in the
6   record, for rejecting the uncontroverted medical opinion of a
7   claimant's treating physician. <u>Holohan v. Massanari</u>, 246 F.3d
8   1195, 1203 (9th Cir. 2001). It is insufficient to rely on the
9   inability of the physician to support the findings with objective
10  laboratory findings because disability may be proved by medically
11  acceptable clinical diagnoses as well as by objective laboratory
12  findings. <u>Rodriquez v. Bowen</u>, 876 F.2d 759, 762 (9th Cir. 1989). A
13  failure to set forth a reasoned rationale for disregarding a
14  particular treating physician's findings is legal error. <u>Cotton</u>
15  <u>v. Bowen</u>, 799 F.2d at 1408.

16       Likewise, the medical opinion of a nontreating doctor may be
17  relied upon instead of that of a treating physician only if the
18  ALJ provides specific and legitimate reasons supported by
19  substantial evidence in the record. <u>Holohan v. Massanari</u>, 246
20  F.3d 1195, 1202 (9th Cir. 2001) (citing <u>Lester v. Chater</u>, 81 F.3d
21  821, 830 (9th Cir. 1995)). The contradictory opinion of a
22  nontreating but examining physician constitutes substantial
23  evidence, and may be relied upon instead of that of a treating
24  physician, where it is based on independent clinical findings
25  that differ from those of the treating physician. <u>Andrews v.</u>
26  <u>Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995). The opinion of a
27  nontreating, nonexamining physician can amount to substantial
28  evidence as long as it is supported by other evidence in the

1 record, such as the opinions of other examining and consulting
2 physicians, which are in turn based on independent clinical
3 findings. <u>Andrews v. Shalala</u>, 53 F.3d at 1041.

4      The evidence supporting the ALJ's credibility findings has
5 previously been summarized.

6      With respect to Dr. Janda, the record also shows that on
7 June 11, 1997, John P. S. Janda, M.D., examined Plaintiff and
8 found only mild muscle spasm at L5-S1; he recommended an exercise
9 program and medication for pain and spasm. (Tr. 320-22). His
10 diagnosis was mild lumbar spondylosis with severe facet
11 arthropathy at L5 and severe disc space compromise at L5/S1. X-
12 rays from January 1998 showed mild degenerative joint disease in
13 the knee. (Tr. 313.) The aspiration of Plaintiff's right knee
14 performed in January 1998 improved his symptoms. (Tr. 311-
15 12). Treatment continued, and Plaintiff's condition appeared
16 essentially stable. (Tr. 307-10.)

17      In March 1998, Dr. Janda filled out a form for the Fresno
18 County Department of Social Services, upon which he indicated
19 that Plaintiff could not perform manual or sedentary labor and
20 was permanently disabled, but he could participate in six hours
21 of adult school on a daily basis with no repetitive bending,
22 stooping, or heavy lifting. Dr. Janda stated that the onset date
23 was that Plaintiff had not worked since 1980. Plaintiff did not
24 require someone in the home for care, and he could provide care
25 for his children. (Tr. 423-25).

26      In April 1999, Plaintiff underwent arthroscopic surgery of
27 his right knee and in follow-up care did well and was prescribed
28 exercise. (Tr. 300, 406-12, 295-97, 393, 395, 398-403).

An X-ray taken in September 1999 after Plaintiff complained of right knee pain reflected mild degenerative joint disease with mild joint space compromise. (Tr. 399.) Dr. Janda opined that Plaintiff suffered mild to moderate degenerative joint disease at the right knee with degenerative cartilagic changes, osteoarthrosis, and status post right knee arthroscopy with continued pain. (Tr. 398.) Dr. Nork's examination of Plaintiff, previously described, also occurred in September 1999, and Dr. Nork found, despite Plaintiff's complaints of joint and back pain, that Plaintiff was in no acute distress, used a cane only for protection, was capable of walking without aid, and had right knee range of motion was within normal limits. It was Dr. Nork's opinion that Plaintiff was limited in his ability to climb, stoop, crawl and kneel, but only on a temporary basis until he recovered from his surgery. (Tr. 362, 358-62.)

In August 1999, state agency physician Thomas W. Dunklin, M.D., reviewed the record and concluded that Plaintiff was capable of medium work (lifting twenty-five pounds frequently and fifty pounds occasionally), sitting, standing and walking for about six hours in an eight-hour day, and could frequently crouch and kneel and only occasionally crawl. (Tr. 93-100).

In September 1999, Dr. Janda opined that Plaintiff was possibly a candidate for Hyalgin injections (Tr. 398).

By February 25, 2000, Plaintiff reported improvement but complained of discomfort in the parapatellar area of the knee, but his primary complaint was low backache and pain in his anterior thigh. (Tr. 393.) X-rays of Plaintiff's knees from the same time again revealed mild degenerative joint disease, and

also mild arthritis (Tr. 392). X-rays of Plaintiff's lumbar spine showed mild levoscoliosis with spina bifida, mild arthropathy, and mild spondylosis. (Tr. 392.)

On February 3, 2000, treating physician Dr. Ramzi Abdulrahman filled out a form in which he opined that Plaintiff had been disabled since June 11, 1997 due to diabetes, high blood pressure, and low back pain with radiculopathy. The only treatment noted was medication. The physician also noted, however, that Plaintiff could perform full-time sedentary work and participate full-time in classroom training and attend adult school for six hours per day with unspecified limitations in stooping, bending, and lifting over twenty pounds. (Tr. 390-91).

On April 5, 2000, Dr. Janda wrote that, as a result of arthroscopic surgery and "chronic low back pain with spondylosis," and based on his examinations, Plaintiff could not lift over ten pounds or perform more than sedentary work, which meant that Plaintiff could sit throughout the workday but could not be on his feet for more than one to two hours in an eight-hour workday. (Tr. 418-19). On April 11, 2000, Dr. Janda completed a "Questionnaire," upon which he indicated that Plaintiff's primary impairments were degenerative joint disease of the right knee, low back pain and lumbar spondylosis. Dr. Janda indicated that these impairments were supported by x-rays. When asked to state how long Plaintiff could sit, stand and walk during an eight-hour work day, Dr. Janda replied "yes" to each, but he indicated that Plaintiff should not engage in prolonged standing or sitting in one position for more than an hour or two. He did not indicate the date on which the conditions began, and

he did not complete the portion of the form concerning Plaintiff's ability to engage in work or lifting of twenty pounds. (Tr. 418.)

On May 8, 2000, Dr. Abdulrahman opined that since June 11, 1997, Plaintiff could not perform full-time work at any level, including sedentary work, due to diabetes and hypertension; he listed no objective findings but referred to a copy of a medical report of February 3, 2000, which was not attached; Plaintiff could sit no longer than sixty minutes or for four hours over an eight-hour period, or for one to two hours during an eight-hour period; he could stand or walk two to three hours over an eight-hour period but for only ten to fifteen minutes at a time; and stand one to two hours in an eight-hour day. He had unspecified limitations in stooping and bending, and in lifting over ten pounds. (Tr. 433.)

With respect to Dr. Janda's opinion of March 1998, the ALJ recited the opinion and then stated:

> Notwithstanding, Dr. Janda's restrictions are not
> consistent with or supported by the medical evidence
> of record.

(Tr. 19.)

A conclusional opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). It is permissible for an ALJ to prefer an opinion supported by specific clinical findings and an explanation thereof over a check-off type of form lacking an explanation of the basis for the conclusions. Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (citing Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983)); see Batson v. Commissioner of the

28

1  <u>Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir.

2  2004). It is appropriate for an ALJ to consider the absence of

3  supporting findings, and the inconsistency of conclusions with

4  the physician's own findings, in rejecting a physician's opinion.

5  <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432-33 (9th Cir. 1995); <u>Matney</u>

6  <u>v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992); <u>Magallanes v.</u>

7  <u>Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). The fact that an opinion

8  is based primarily on the patient's subjective complaints may be

9  properly considered. <u>Matney on Behalf of Matney v. Sullivan</u>, 981

10 F.2d 1016, 1020 (9th Cir. 1992). Indeed, where the record supports

11 an ALJ's rejection of the claimant's credibility as to subjective

12 complaints, the ALJ is free to disregard a doctor's opinion that

13 was premised upon the claimant's subjective complaints.

14 <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).

15      Here, the record supports the ALJ's finding that the

16 clinical findings and medical evidence of record did not support

17 the extent of disability that Dr. Janda concluded that Plaintiff

18 suffered. The ALJ specifically noted Dr. Nork's functional

19 evaluation with only temporary restrictions (Tr. 20), the mild

20 abnormalities reflected in the x-rays of February 2000, and the

21 lack of significant clinical findings in Dr. Janda's examination

22 of Plaintiff in February 2000 (Tr. 20).

23      The ALJ further noted Dr. Abdulrahman's statement of

24 February 2000 that Plaintiff could perform only full-time

25 sedentary labor, training, and education and stated:

26          The doctor's conclusion is not supported by treatment
            records or objective tests and is based on unsubstantiated
27          subjective statements of claimant.

28 (Tr. 21.)

Plaintiff argues that Dr. Abdulrahman's opinion is fully supported by his own records, citing to records from 1997 through and 1999 showing some continued complaints of pain in the back and knee but largely controlled diabetes and hypertension as previously discussed, and only tenderness in the lumbar spine on examination. (Tr. 340-56, 426-34.) These records warrant an inference that Plaintiff continued to complain of subjective complaints concerning his joint problems, but there is no indication of any change in treatment for the pain, and as previously noted, there appears to be a stabilization of Plaintiff's hypertension and diabetes. Substantial evidence supports the ALJ's rejection of Dr. Abdulrahman's opinion. The medical evidence of record, as distinct from Plaintiff's subjective complaints, generally revealed only mild clinical symptoms on examination. Further, it is noted that as of April 2000, even Dr. Janda opined that Plaintiff was capable of sedentary work. (Tr. 419.) Finally, Plaintiff's reliance on the use of a cane in January 1998 after aspiration of the knee (Tr. 311) and again protectively in September 1999 following the April 1999 arthroscopic knee surgery (Tr. 358) is not determinative; Plaintiff reported that he did not need to use the cane (id.), and the treating doctors' notes for later 1999 and early 2000 reveal very limited or an absence of complaints about the knee as well as affirmative acknowledgment of improvement the knee. Dr. Janda did not even mention the knee condition in his opinion of permanent disability of February 2000. (Tr. 390-395, 368-80.)

The Court concludes that the ALJ gave specific and legitimate reasons, supported by substantial evidence, for

1  rejection the treating doctors' opinions. The ALJ was entitled to
2  rely on the opinion of the state medical consultant, which
3  constituted substantial evidence consistent with or supported by
4  other evidence in the record.

5       B. <u>Simple, Repetitive Tasks</u>

6       Plaintiff argues that the limitation to simple, repetitive
7  tasks is not supported by substantial evidence; further, the ALJ
8  omitted the limitation regarding being around the public.

9       Dr. Evangeline Murillo completed a psychiatric review
10 technique form in November 1999 and opined that Plaintiff had
11 depressive syndrome characterized by mild psychomotor retardation
12 and difficulty concentrating which constituted major depression
13 that was moderate; Plaintiff had slight restriction of activities
14 of daily living, maintaining social functioning, and "seldom"
15 deficiencies of concentration, persistence, or pace with no
16 evidence of episodes of decompensation; his mental RFC was
17 assessed as moderately limited in the ability to understand,
18 remember, and carry out detailed instructions and in the ability
19 to interact appropriately with the general public; he was able to
20 understand simple and repetitive tasks, sustain concentration and
21 persistence, and socialize adequately if public contact was
22 limited because of Plaintiff's nervousness around people. (Tr.
23 72-84.)

24      The ALJ expressly noted Dr. Greenleaf's October 1999
25 consultative evaluation in which it was noted that Plaintiff was
26 capable of following simple commands, could function in an
27 environment with little peer or public contact, and could get to
28 work promptly and regularly and work with adequate pace and

31

1  persistence. (Tr. 21.) Although there was no mention of limited

2  public contact in the ALJ's statement of Plaintiff's RFC, the ALJ

3  expressly noted Dr. Greenleaf's conclusion that Plaintiff could

4  perform simple, repetitive tasks with little public contact. (Tr.

5  22.) Further, the VE was specifically asked at the hearing

6  whether his opinion that Plaintiff could perform the light,

7  unskilled work of automatic sewing machine operator and the

8  medium unskilled work of seed cutter and hand packager would be

9  changed if the claimant could not interact with the public

10 closely, and the VE replied it would not. (Tr. 508-10, 511-12.)

11 Thus, it does not appear that the ALJ's conclusion was

12 unsupported by substantial evidence.

13             C. <u>Combined Impairments</u>

14      Plaintiff argues that Plaintiff's other impairments,

15 including knee arthritis, lumbar arthritis, status post foot

16 surgery, diabetes, gout, and incontinence were not "considered

17 heavily or at all" by the ALJ. Defendant does not respond to this

18 argument.

19      The Ninth Circuit has cautioned that despite its holding in

20 <u>Celaya v. Barnhart</u>, 332 F.3d 1177, 1181 (9th Cir. 2003), it

21 remains the burden of a claimant to furnish evidence that her

22 impairments, in combination, caused functional limitations. <u>Burch</u>

23 <u>v. Barnhart</u>, 400 F.3d 676, 681-83 (9th Cir. 2005).

24      The Court notes that the ALJ considered all impairments that

25 appeared to affect Plaintiff's work functioning. As previously

26 reviewed in connection with the analysis of the ALJ's treatment

27 of Plaintiff's credibility, the ALJ considered in detail

28 Plaintiff's knees, lumbar condition, and gout. It appears that

1  Plaintiff's status post urinary surgery performed in September

2  1998 resulted in sexual dysfunction and some constipation; there

3  is a single notation of incontinence in May 1999 and an

4  indication of 2 for nocturia, but the remainder of the records

5  cited by Plaintiff indicate that Plaintiff's remaining functional

6  complaints concerned sexual dysfunction. Plaintiff's surgery for

7  release of bilateral plantar fasciitis occurred in June 1997.

8  (Tr. 246-47.) Thereafter he suffered a gouty flare in January

9  1998, with x-rays showing mild degenerative joint disease and a

10 heel spur on the right, and a small bunion and spur with mild

11 degenerative joint disease in the left. (Tr. 263, 313-15.) In

12 April 2000 he had redness on the bottom of his feet, but no

13 lesions, ulcers, or infections. (Tr. 435.) Contrary to

14 Plaintiff's assertion, the record does not reveal that the ALJ

15 failed to give adequate treatment to Plaintiff's foot impairment.

16     In summary, Plaintiff's arguments should be rejected, and it

17 is concluded that the ALJ's decision was reached by the use of

18 proper legal standards and is supported by substantial evidence.

19                         RECOMMENDATION

20     Accordingly, it IS RECOMMENDED that

21     1. Plaintiff's social security complaint BE DENIED; and

22     2. Judgment for Defendant Jo Anne B. Barnhart, Commissioner

23 of Social Security, and against Plaintiff Ramon Briseno, BE

24 ENTERED.

25     This report and recommendation is submitted to the United

26 States District Court Judge assigned to the case, pursuant to the

27 provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the

28 Local Rules of Practice for the United States District Court,

Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:** __November 13, 2006__          _____/s/ Sandra M. Snyder_____
icido3                               UNITED STATES MAGISTRATE JUDGE

34